UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA K. FOSTER and<br>WILLIAM J. FOSTER,<br><br>           Plaintiff,<br><br>           v.<br><br>LOCAL UNION 8A-28A METAL<br>REFINISHERS, PAINTERS, SIGN &<br>DISPLAY, EQUIPMENT & AUTOMOTIVE<br>PAINTERS, AND ALLIED TRADES, OF THE<br>INTERNATIONAL UNION OF PAINTERS<br>AND ALLIED TRADES; PAINTERS<br>DISTRICT COUNCIL #14 OF THE<br>INTERNATIONAL UNION OF PAINTERS<br>AND ALLIED TRADES (of Chicago,<br>and Cook, Lake, Grundy, and Will<br>counties); THE INTERNATIONAL UNION<br>OF PAINTERS AND ALLIED TRADES;<br>STUART-DEAN CO. INC., a New York<br>corporation; UNKNOWN ENTITIES,<br>similarly situated to Stuart-Dean Co., Inc.;<br>HECTOR LOPEZ, individually;<br>ALVIN McNEAL, individually;<br>ROBERT GIERUT, individually;<br>JOSEPH RINEHART, individually; and<br>JOHN DOES 1-100, individually,<br><br>           Defendants. | No. 16 C 4174<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Laura and Bill Foster, who were both at one time employed as painters with the Chicago Transit Authority, bring this civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Illinois state whistleblower statute, and common law. Plaintiffs allege that their union and several companies and individuals engaged in a years-long scheme to bury complaints by union members in exchange for bribes, and to skim funds out of union accounts. The Defendants—the union, a company that hired union labor, and several individuals including the union's one-time President—moved to dismiss the RICO claim because, among other reasons, the statute of limitations has expired. This opinion addresses

only the RICO claim, which is Plaintiffs' only federal claim and the sole question briefed by the parties.

The statute of limitations for civil RICO actions is four years. Plaintiffs claim that they were injured by the RICO enterprise ("the Enterprise") on several occasions, including when the Enterprise engineered their respective firings in July 2008 and January 2012. This action was not filed until April 2016. As explained here, the court concludes that Plaintiffs' RICO claim is barred by the statute of limitations. The court's reasoning follows.

## BACKGROUND

On a motion to dismiss, the court takes the facts alleged by the Plaintiffs as true. *Berger v. Nat'l Coll. Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016). The facts below come from Plaintiffs' Amended Complaint. (Am. Compl. [19].)

**I.   The Alleged Enterprise**

Plaintiffs Laura and Bill Foster were both hired as painters by the Chicago Transit Authority ("CTA") in the 1980s. (Am. Compl. ¶¶ 48–49.) The CTA's equipment painters and refinishers are represented in collective bargaining by Local Union 8A-28A Metal Refinishers, Painters, Sign & Display, Equipment & Automotive Painters, and Allied Trades ("Local 8A"), which is affiliated with the International Union of Painters and Allied Trades ("IUPAT"). (Am. Compl. ¶¶ 37.) IUPAT has District Councils comprised of local unions, and Local 8A is one of fourteen unions making up Painters' District Council #14. (Am. Compl. ¶ 39.) Both of the Fosters were very active in Local 8A, working as union stewards and holding positions on union committees and executive boards. (Am. Compl. ¶¶ 48, 51.)

Local 8A represents painters at other employers, as well. The Fosters claim that many other employers[1] "habitually violat[ed] [Local 8A's] collective bargaining agreements." (Am. Compl. ¶ 5.) One firm, Stuart Dean Company ("SDC"), failed to pay Local 8A members the

---

[1]   It is unclear whether the Fosters believe that the CTA also engaged in violations of these collective bargaining agreements.

2

negotiated wages. (*Id.*) Presumably in their capacity as union stewards or committee members, the Fosters complained to various unidentified officials within Local 8A, Painters' District Council #14, and IUPAT that SDC (and other unidentified "similarly-situated" companies) violated the collective bargaining agreement. (*See* Am. Compl. ¶ 10.) The complaint is not entirely clear about what those violations were—if there were other breaches besides failure to pay negotiated wages, they are not identified.

Sometime in 2005, the Fosters observed that their complaints were not yielding any meaningful results, and began to suspect that "something was amiss" about Hector Lopez, Local 8A's union president. (Am. Compl. ¶ 10.) What was amiss, the Fosters claim to have discovered over the next several years, was that Lopez and his collaborators within the union and the CTA were engaged in an enterprise to take bribes in exchange for suppressing complaints about collective-bargaining violations against employers like SDC. Lopez and others also allegedly skimmed funds from the union. The complaint says little about how the Fosters discovered this, and instead focuses on their efforts to fight back against Lopez and the Enterprise.

Among those efforts was the Fosters' attempt—at a time not stated in the complaint—to replace Lopez as president of Local 8A. (Am. Compl. ¶ 14.) Both of the Fosters had been nominated for president by the Local 8A membership, but Lopez "succeeded in quashing each of their nominations" by "falsely stating they had been effected improperly." (Am. Compl. ¶ 14.) The complaint provides no further detail about these circumstances. The Fosters nevertheless were successful in some degree: Laura was appointed Vice President and Bill was elected to be a regional trustee and local board officer in June 2007. (*Id.*) Shortly after Laura's election— exactly when is not alleged—Lopez threatened Laura and Bill with physical violence, and told other unidentified individuals that he would "eliminate" Laura. (Am. Compl. ¶ 61.)

At some point prior to July 2008, Laura was hired by the union as a full-time representative, and went on leave of absence from the CTA in order to work in that role. (Am.

3

Compl. ¶ 16.) In July 2008, while serving as the union's vice president and as a full-time union representative, Laura overheard Lopez and the Local 8A area representative, Richard Croll, speaking with unidentified SDC managers about terminating Laura from her position as a union representative. (Am. Compl. ¶ 16.) SDC's management allegedly promised Lopez a $50,000 bribe in order to "neutralize" the Fosters by, in part, firing Laura from her position. (Am. Compl. ¶¶ 16–17.) The same day that Laura overheard this conversation, the Fosters allege that Lopez "threatened Laura's life to her face;" the complaint does not reveal precisely what Lopez said or whether it was related to his agreement with SDC. (Am. Compl. ¶ 63.)

Other unidentified members of the union filed charges internally with IUPAT on July 9, 2008. (Am. Compl. ¶ 66.) What it means to file a charge with the national union is not further explained, nor does the complaint say exactly what the charges were. The Fosters also do not explain how other members of the union learned of the threat, but Plaintiffs allege that Lopez's threat against Laura "push[ed] them [the other unidentified union members] over the edge" into filing. (*Id.*) IUPAT did not remove Lopez, however; instead "[t]he Enterprise made it known that IUPAT had refused to remove Lopez from his position as president of LOCAL 8A, specifically to prevent Laura (then LOCAL 8A vice president) from ascending to that office in accordance with applicable rules of succession." (Am. Compl. ¶ 69.) The complaint provides no more information about the actors involved in this incident, or how the Enterprise made this information "known" to the Fosters or more generally. On July 17, 2008, Lopez fired Laura from her position as a union representative. (Am. Compl. ¶ 82.) Laura was replaced by Alvin McNeal. (*See* Am. Compl. ¶ 34.)

In response to all of this, Laura and Bill filed charges against the union with the National Labor Relations Board ("NLRB"). Again, precisely what those charges were is not described in the complaint, though at least one charge was that Laura had been wrongfully terminated. (Am. Compl. ¶¶ 24–26.) The Fosters claim that an attorney representing the union, Roger Madon, stated to the NLRB that the union—and he—was in fact representing the Fosters; in essence,

4

Madon allegedly misled the NLRB examiners into believing that the Fosters' charges were against the Chicago Transit Authority, rather than against the union itself. (Am. Compl. ¶ 26.) The NLRB accordingly dismissed the charges and directed Plaintiffs to file their charges with the Illinois Labor Relations Board ("ILRB"), which has jurisdiction over the CTA as a municipal agency. (*Id.*) On January 18, 2009, McNeal—Laura's replacement as union representative—sent an e-mail to unidentified members of the Enterprise, noting with some satisfaction that the deadline for the Fosters to re-file a complaint with the NLRB had passed on January 16. (Am. Compl. ¶ 25.) The Fosters take this as evidence that the Enterprise deliberately misled the NLRB to mire the Fosters in procedural obstacles, with hopes that their claims would expire on statutes of limitations grounds. (Am. Compl. ¶ 26.)

Charges were again filed, this time at the ILRB—presumably by Laura and Bill, though the complaint obscures this with the passive voice—against Local 8A, Lopez and others. (Am. Compl. ¶ 76.) The charges were not resolved at the ILRB for six years, a delay that the Fosters construe as evidence that the Enterprise's influence extended to the ILRB, as well. (Am. Compl. ¶ 27.) The complaint details several reasons for this suspicion. (Am. Compl. ¶¶ 78–80). Robert Gierut "oversaw work on the plaintiffs' claims at the ILRB," and ultimately revealed himself to be a loyal member of the Enterprise by his retaliation against Laura, in his role as the vice president of labor relations at the CTA, when she returned to work there (this incident is discussed below). (*See* Am. Compl. ¶ 78.) Gierut's supervisory role at the ILRB is not further explained, but the Fosters suspect that he contributed to the case's languishing without resolution at the ILRB. (*Id.*) The Enterprise also successfully replicated its gambit at the ILRB in which another union attorney, John Toomey, claimed to represent the Fosters. (Am. Compl. ¶ 79.) By doing so, he was granted access to documents that were "supposed to remain protected from disclosure to the respondents in the ILRB actions" (Am. Compl. ¶ 80)—what these documents were is not explained—and otherwise created confusion that slowed the proceedings. (Am. Compl. ¶ 81.) The charges before the ILRB were eventually resolved; the

5

Fosters do not explain how or when, but the court presumes that the resolution was not favorable to them.

The next several years involve a series of twists and turns: IUPAT allegedly turned on Lopez, Lopez in response attempted to "disaffiliate" Local 8A from IUPAT, and IUPAT placed Local 8A in trusteeship; IUPAT filed suit against Lopez and Local 8A with Laura as lead plaintiff in a New York federal court case, resulting in a permanent injunction removing Lopez from the presidency and permitting Laura to run for union office; IUPAT then decided it did not want Laura and Bill involved in union leadership and dissolved Local 8A into twelve separate locals, diminishing any power Laura and Bill might wield. (Am. Compl. ¶¶ 84–92.)

In September 2010, Laura and Bill reported Lopez's wrongdoing to the United States Department of Labor ("DOL"). (Am. Compl. ¶ 28.) Specifically, they reported that Lopez was engaged in skimming funds from the union's operating accounts, as well as the health and welfare accounts meant for union members, and with taking a bribe from SDC to fire Laura. (*Id.*) As a result of the Fosters' report, Lopez was eventually indicted for this conduct and pleaded guilty to mail fraud, wire fraud, and filing false tax returns in April 2013. (Am. Compl. ¶ 29.) Lopez was sentenced to four years in prison and ordered to pay restitution; to whom the restitution would be made is not mentioned in the complaint. (*Id.*) Though Lopez remains incarcerated, the Fosters claim that the Enterprise continues to "target and retaliate against the plaintiffs through the present day in order to make them an example and discourage other, honest union members for standing up to corruption like the plaintiffs did." (Am. Compl. ¶ 30.)

## II. Injuries to Plaintiffs

The Enterprise's alleged retaliation against the Fosters has taken several forms. A few months after Lopez fired Laura as union representative, she returned to her full-time job at the CTA on September 9, 2008. (Am. Compl. ¶ 93.) Her return, the Fosters allege, was sabotaged by the Enterprise: Robert Gierut, in his role as the CTA's vice president of labor relations, demoted Laura to a journeyman position at Lopez and McNeal's behest. (Am. Compl. ¶ 94.)

The complaint is not entirely clear as to what position Laura held before she was demoted; she was, at one time, a foreman painter (allegedly the first female trades foreman with the CTA), but she had held several other positions as well. (*See* Am. Compl. ¶ 49.) But Laura was unable to work as a journeyman painter when she returned to the CTA because of medical restrictions (the court infers that journeyman work is more physically taxing), and after attempting to perform journeyman work for some time, Laura was forced to accept "disability pension" status on an unknown date. (Am. Compl. ¶ 100.) (SDC, in its brief, states that this occurred in 2011; that date does not appear on the face of the complaint. (Stuart Dean. Co's Mem. in Supp. of Mot. to Dismiss [65], at 4.) The court is uncertain of Laura's current employment status with the CTA.

In addition to engineering Laura's demotion, the Fosters claim that Lopez "and other Enterprise members" (unnamed in the complaint) pilfered funds from Laura's pension and 401(k) contributions. (Am. Compl. ¶ 102.) The Fosters say very little about this aspect of the Enterprise; how much was taken, when the scheme began, or when Laura discovered the theft are questions unanswered by the complaint. Also unclear is whether this was the same pattern of activity as Lopez's raiding the union accounts and health and welfare fund. (Am. Compl. ¶ 60.) This underfunding has never been remedied. (Am. Compl. ¶¶ 102.)

The Enterprise retaliated against Bill as well. At some point (the complaint does not say when), a union representative called a meeting of CTA painters and told them that Laura and Bill were responsible for the painters' not receiving a raise. (Am. Compl. ¶ 106.) When Bill prepared a grievance about this, a union steward with Painters' District #14, Douglas McBee, threatened to make false statements to the CTA (presumably, to get Bill fired or disciplined) if he did not back down. (Am. Compl. ¶ 107.) Bill refused, and McBee succeeded in convincing the CTA to fire Bill on January 26, 2012. (Am. Compl. ¶ 109.) Bill successfully "fought the termination"—how, exactly, is not explained—and managed to get reinstated on October 31, 2013. (*Id.*) Things were relatively quiet for two years, until November 2015, when Joseph Rinehart, a Painters' District # 14 representative, failed to file a grievance for Bill after the CTA

engaged in some kind of retaliatory discipline against Bill (what the discipline was, what prompted it, or who at the CTA did this is not stated). (Am. Compl. ¶ 110.) The union lulled Bill into believing that it would file a grievance for him—who at the union made these representations is not identified, though presumably it was Rinehart—but never did, allowing the relevant deadline to pass. (*Id.*)

A few months later, in January 2016, CTA suspended Bill for three days. (Am. Compl. ¶ 111.) The suspension, the Fosters claim, was the result of more false statements made to CTA management about Bill by "individuals loyal to the Enterprise," but again, who, what, or why is not laid out in the complaint. (*Id.*) Rinehart refused to file a grievance for Bill unless he signed on with one the local unions that Local 8A had been split into, but Bill refused to do so. (Am. Compl. ¶ 112.) In the Fosters' view, for Bill to accede to this demand would be "tantamount to conceding and could destroy any chance of righting the wrongs perpetrated by the Enterprise," and, they allege, Rinehart knew this. (*Id.*) The Fosters also claim that Bill was damaged by the Enterprise in lost wages and pension contributions. (Am. Compl. ¶ 113.)

Laura and Bill filed their complaint *pro se* on April 8, 2016. (*See generally* Compl. [1].) After amending their complaint, the Fosters now name as defendants Local 8A, IUPAT, Painters' District Council #14, Stuart Dean Company and other unknown entities that engaged in the wage scheme, and several individuals—Lopez, Gierut, Rinehart, McNeal and one hundred John Does. (Am. Compl. ¶¶ 33–43.) Count I of the amended complaint is a RICO claim, followed by thirteen Illinois statutory and common-law claims. (*See generally* Am. Compl.) Defendants have moved to dismiss the RICO claim for a number of reasons, including timeliness: they argue that RICO's four-year statute of limitations has elapsed on the Fosters' claim.[2] For the reasons below, the court grants that motion.

---

[2] Only Stuart Dean Company's motion discusses the statute of limitations issue at length (Stuart Dean Co.'s Mem. in Supp. of Mot. to Dismiss Count One [65]), but the other Defendants have joined in that position.

8

**DISCUSSION**

I.     **Legal Standard**

On a motion to dismiss, the court accepts as true all factual allegations and draws all permissible inferences in the plaintiffs' favor. *Sabrina Roppo v. Travelers Comm. Ins. Co.*, No. 15-3171, --- F.3d ---, 2017 WL 3695205, at *14 (7th Cir. Aug. 28, 2017). A plaintiff can "plead herself out of court by alleging facts that show she has no legal claim." *Id.* (quoting *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016). If, based on the allegations of the complaint, a claim is "indisputably time-barred," it may be dismissed on the pleadings. *Rosado v. Gonzalez*, 832 F.3d 714, 716 (7th Cir. 2016).

II.    **RICO Statute of Limitations**

The Racketeer Influenced and Corrupt Organizations Act provides civil remedies to those injured by persons engaged in ongoing criminal organizations. *See* 18 U.S.C. § 1964. It is a violation of RICO "for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). RICO is thus aimed at the activities of an "enterprise" that is engaged in a pattern of racketeering activity. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 823 (7th Cir. 2016). An enterprise must be distinct from any particular defendant: The defendants must have "conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009) (quoting *Reves v. Enst & Young*, 507 U.S. 170, 185 (1993)) (internal quotations omitted) (emphasis in original). A common example of a RICO enterprise is a protection racket, in which a group of criminals extracts monthly "insurance" payments from businesses under threat of force. *See Empress Casino Joliet*, 831 F.3d at 828.

"Racketeering activity" includes many types of criminal activity as defined in the statute. Relevant here, racketeering may include mail and wire fraud, extortion, and embezzlement of

9

union funds. *See* 18 U.S.C. § 1961(1). Because only a *pattern* of activity violates RICO, a plausible claim must allege at least two "predicate acts" of racketeering. *See Empress Casino Joliet*, 831 F.3d at 827.

The statute of limitations on a RICO civil claim is four years. *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 383 (7th Cir. 2010). The limitations period begins running when the plaintiff is injured by a predicate act, even if the enterprise continues committing criminal acts after that date. *Id.* at 386–87. Due to RICO's pattern requirement, a RICO claim cannot accrue at the time of the first predicate act, but any acts after the second or subsequent acts that injure the plaintiff start the statute of limitations. *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801–02 (7th Cir. 2008).

Plaintiffs allege that the RICO enterprise began as early as 2005—nearly ten years before the suit was filed—when they noticed that Lopez and the union were sweeping their complaints against SDC and other companies under the rug. (Am. Compl. ¶ 10.) Beginning at that time, the Fosters allege, the Enterprise caused them to lose wages and benefits; these losses continued throughout the ordeal and to this day. (Am. Compl. ¶ 102.) The complaint lacks specifics about which companies, other than SDC, were underpaying union members and when, but for purposes of this ruling, the court will characterize that entire activity of the Enterprise as a single predicate act. Both of the Fosters have alleged a second predicate act resulting in injury: they were fired.[3] Laura was fired on July 17, 2008, and demoted when she returned to work in September 2008. (Am. Compl. ¶¶ 82, 93.) Bill was fired on January 26, 2012. (Am. Compl. ¶ 109.) If these firings were acts of the Enterprise—as the Fosters claim they were—they occurred more than four years before the complaint was filed on April 8, 2016. The statute of limitations accordingly bars the claim.

---

[3] Some of the Defendants argue that the Fosters' firings are not RICO-qualifying predicate acts; the court need not reach this question and instead accepts the Fosters' allegation that the firings were predicate acts for the purposes of ruling on the statute of limitations argument. (Pls.' Resp. in Opp. to Mot. to Dismiss [72], at 13–15.)

The Fosters' response to this concern is unhelpful. They assert that the Enterprise was engaged in "continuous violations" of RICO, and accordingly, the statute of limitations does not bar the claim as long as any act falls within the limitations period. (*See* Pl.'s Resp. in Opp. to Mots. to Dismiss [72], at 16.) But in the sole case Plaintiffs cite for this proposition, *Limestone Development Corp.*, the Seventh Circuit rejected the very interpretation of the "continuing violation" doctrine that the Fosters advocate.

In *Limestone Development Corp.*, the plaintiff developer, Limestone, alleged that the defendants—the Village of Lemont, several other public bodies including the Park District, and a local chemical company—engaged in racketeering to prevent the plaintiff from developing a tract of land it owned within the Village. 520 F.3d at 799. Limestone claimed that predicate acts for a pattern of racketeering occurred in 1993, when the Village and other defendants attempted to force Limestone to sell the property, and again in 2000, when the defendants launched a frivolous eminent domain proceeding against Limestone. *Id.* at 800. Later, in 2003, the Village published an article in the *Village News* that led readers to believe the Village owned the property, which Limestone claimed undermined its efforts to sell the property. *Id.* Limestone filed the RICO action in 2005. *Id.*

The Village moved to dismiss the action as untimely. *Id.* In response, Limestone attempted to invoke the "continuing violation" doctrine; Limestone contended that the RICO enterprise continued until at least 2003 when the article was published, well within the limitations period, and was thus actionable regardless of when Limestone's injury first accrued. *Id.* at 800–01. The Seventh Circuit rejected Limestone's proposed application of the continuing violation doctrine in RICO cases, observing that such a rule "does not make good sense, and is not the law." *Id.* at 801. The statute of limitations begins to run when the injury accrues, the court observed, and subsequent injuries do not toll the statute. *Id.* The court explained that the purpose of the "continuing violation" doctrine is not to toll the statute of limitations when additional injuries occur, but to permit a plaintiff to recover when a defendant's acts do not

11

accumulate into an injury until after the statute of limitations has elapsed on the earlier acts. *Id.* For instance, in the employment context, "a coworker's offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable," regardless of whether each act falls within the statute of limitations. *Id.*

The critical question, then, is when the Enterprise inflicted an injury on the Fosters: once the injury occurs, the statute of limitations begins to run, and "[a] 'plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period.'" *Id.* at 802 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997)). Plaintiffs are correct that a RICO conspiracy requires at least two predicate acts and an injury "cannot accrue at the time of the first predicate act." *Id.* But, as *Limestone* makes clear, once two predicate acts occur and cause the plaintiff's injury, the statute of limitations begins to run and is not tolled by later wrongdoing. Plaintiffs' complaint identifies a number of predicate acts and injuries to the Fosters, but at a minimum, Laura and Bill's firings followed the primary scheme conducted by the Enterprise: Lopez's scuttling the Fosters' complaints in 2005 about SDC's violation of the collective bargaining agreement by failing to pay union scale. Considering that conspiracy a single predicate act—and setting aside the myriad other Enterprise acts alleged by the Fosters—Laura's firing in 2008 was at the least a second predicate act, and Bill's firing a third. Because the Fosters filed suit on April 8, 2016, more than seven years after Laura's firing in 2008 and more than four years after Bill's firing on January 26, 2012, Plaintiffs' RICO claim is untimely. Count I of the complaint is accordingly dismissed.

### III. Supplemental jurisdiction

The Fosters' complaint contains thirteen other claims, all arising under Illinois state and common law. (*See* Am. Compl. ¶¶ 126–208.) Because the RICO claim is the Fosters' only federal claim, the court must decide whether to exercise supplemental jurisdiction over the

remaining state-law claims in the complaint. A district court "may decline to exercise supplemental jurisdiction" over state-law claims when "the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c). When the court has dismissed all federal claims before trial, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (quoting *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010)). There are a few exceptions to this presumption:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*See id.* (quoting *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009)). Plaintiffs have not addressed the timeliness of their state law claims, or whether dismissal of this case will bar them. The remaining exceptions are not available: briefing at this stage was limited to the Fosters' sole federal claim (the RICO claim), so that there would be no significant duplication of effort in the event the court were to relinquish jurisdiction over the state-law claims. (*See* Minute Order (Jan. 26, 2017) [44].) Plaintiffs' remaining claims may well be actionable under Illinois state and common law; the merit of those claims is not so obvious that retention of jurisdiction is warranted. The court declines to exercise supplemental jurisdiction, and the amended complaint is dismissed.

## **CONCLUSION**

Stuart Dean Company's motion to dismiss [64] argues that the statute of limitations has run on Plaintiff's RICO claim. The court agrees. The RICO claim, Count I of Plaintiffs' amended complaint, is dismissed. As that claim was the only basis for the court's jurisdiction over this complaint, the court is inclined to dismiss it without prejudice to litigation in state court. Plaintiffs will have 21 days leave in which to file an amended complaint, if they can state a timely federal claim or establish that the court's relinquishment of jurisdiction over this case will result in

13

dismissal of otherwise-timely state law claims. Stuart Dean Company's motion [64] is granted. The motions to dismiss filed by the Painters' District Council #14 [53], Rinehart [56], Gierut [60], and Local 8A [63] are stricken as moot.

ENTER:

*[signature: Rebecca R. Pallmeyer]*

Dated: September 18, 2017

REBECCA R. PALLMEYER
United States District Judge